UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BARBARA A. G.,                          )
                                        )
        Plaintiff,                      )
                                        )
    vs.                                 )         Case No. 4:19 CV 1649 (JMB)
                                        )
ANDREW M. SAUL,                         )
Commissioner of the Social             )
Security Administration,               )
                                        )
        Defendant.                      )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On September 8, 2016, plaintiff Barbara G. filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset date of December 10, 2015. (Tr. 195-96). After plaintiff's application was denied on initial consideration (Tr. 131-35; 113-27), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 139-40).

Plaintiff and counsel appeared for a hearing on July 12, 2018. (Tr. 86-112). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Delores Gonzalez, M.Ed. The ALJ issued a decision denying plaintiff's applications on October 31, 2018. (Tr. 31-41). The Appeals Council

denied plaintiff's request for review on May 22, 2019.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.      Disability and Function Reports and Hearing Testimony

Plaintiff was born in March 1969 and was 46 years old on the alleged onset date.  She lived alone.  (Tr. 91).  She graduated from college.  (Tr. 94).  Between 1994 and 2015, she worked as a senior research technician at a university-based research institute.  (Tr. 95-96).

In 1997, plaintiff underwent several surgical procedures to address obstructive hydrocephaly and a Chiari malformation.[1]  (Tr. 93, 399-400).  She was in a coma for several weeks, following which she required extensive physical and occupational therapy.  (Tr. 385).  Subsequently, she was diagnosed with Type 1 diabetes mellitus, neuropathy, Hashimoto's disease,[2] pernicious anemia, and fibromyalgia.  In addition to these conditions, plaintiff identifies as contributing factors a history of severe whiplash in 2009, two surgeries on her leg, foot drop, allergies and asthma, allergic reaction to small pox vaccine, temporomandibular joint syndrome (TMJ), severe cognitive impairments, torn and bulging discs, nerve problems in legs, chronic urticaria (hives), severe chronic pain, and sleep deprivation.  (Tr. 92-94, 98, 100, 217).  She saw a physical therapist, endocrinologist, and neurologist, and had at least five medical visits a month.  (Tr. 100).  She identified severe pain as a daily problem that interfered with her sleep,

---

[1] "Chiari malformations are structural defects in the base of the skull and cerebellum, the part of the brain that controls balance.  Normally the cerebellum and parts of the brain stem sit above an opening in the skull that allows the spinal cord to pass through it (called the foramen magnum).  When part of the cerebellum extends below the foramen magnum and into the upper spinal canal, it is called a Chiari malformation (CM)."  Chiari Malformation Fact   Sheet.    https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Chiari-Malformation-Fact-Sheet  (last visited Feb. 24, 2020).

[2] Hashimoto's disease is an autoimmune disorder that can cause hypothyroidism, or underactive thyroid.  https://www.niddk.nih.gov/health-information/endocrine-diseases/hashimotos-disease (last visited Feb. 24, 2020).

daily activities, and ability to care for herself.  She showered only once or twice a week and stated that she had once gone for two weeks without showering.  (Tr. 105-06).

Plaintiff testified that she sustained a brain injury and that it now took her a longer time to learn new things.  (Tr. 102).  In addition, her memory was impaired.  She testified that her symptoms mirror those of people with ADHD and she took Adderall to help her process and remember new information.  (Tr. 103).  She testified that her neurologist talked her into applying for disability because her  "brain is shut down" and it was not anticipated that her conditions would improve.  (Tr. 112).

As described in her November 2015 Function Report (Tr. 242-54), plaintiff's daily activities consisted primarily of using a TENS unit on "all [the] places that hurt" for several hours, while napping and watching television.  If she felt well enough, she completed about ten minutes of housework.  (Tr. 242).  Her hobbies previously included reading, drawing, and volunteering as a dog trainer.  She could no longer stand long enough to work as a dog trainer and she limited her reading and drawing due to pain.  She stated that she was awakened by pain every two or three hours and often woke with a headache.  With respect to self-care, she wrote that she took longer to dress than previously, took short showers, and typically ate out because it was too hard to stand to cook, although she was able to prepare simple meals.  She did not do yard work because she was allergic to grass and most plants.  Friends used to help her with household chores, but they no longer had the time to do so and plaintiff noted that she would have to "start paying someone soon."  (Tr. 243).  If she did more than five or ten minutes of housework, she needed to put ice packs on her neck and rest her legs.  In addition, her blood sugar "crashed."  She had to change position after about five minutes of standing to relieve pain in her legs and feet and she needed to rest for ten minutes after walking for 10 to 20 minutes.

She could sit for about 30 minutes.  She needed reminders to take her medications and check her blood sugar.  Her medications caused weight gain, fatigue, brain fog, nausea, headaches, mood swings, and shakiness.  She was able to drive, go out by herself, shop in stores, and manage financial accounts, although she frequently forgot to pay bills on time.  She followed simple written instructions without difficulty but struggled with spoken instructions.  She thought she coped with the stress of her medical conditions pretty well but changes to her routine had a negative impact on her diabetes and brain injury.  (Tr. 246).  She had become reclusive, but had dinner with friends once or twice a month.  She used a brace or splint, a cane, a wheelchair, a scooter, a walker, and compression sleeves.  Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, and following instructions.  Plaintiff wrote that she seemed to be getting new medical conditions all the time and frequently the treatment for one condition aggravated another.  (Tr. 247).

In November 2016, plaintiff listed seven oral medications for neuropathic pain: gabapentin, tramadol, Cymbalta, Topamax, Effexor, Wellbutrin, and Savella.  (Tr. 258-59).  She also used several topical pain medications.  In December 2016, her medications included Adderall for her "brain," Flexeril and Lidocaine patches for pain, Zyrtec and injections for allergies, four medications for asthma, two medications for diabetes, levothyroxine and Liothyronine for hypothyroidism, and vitamins B1, B12, D, and E.  (Tr. 271).  She also had a TENS unit and diabetes supplies.

Plaintiff worked at a university-based research institution from 1994 until she was laid off in December 2015.  Initially, she worked in a lab preparing samples for and operating DNA sequencing machines.  In 2011, it became too difficult for her stand at the bench and she

switched to a desk job where she primarily worked at a computer.  (Tr. 95-96).  Vocational expert Delores Gonzalez characterized plaintiff's past jobs as cytogenetic technician and data entry clerk, performed as sedentary and skilled work.  (Tr. 107).  Ms. Gonzalez was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was limited to light work with no nonexertional limitations, and who had to avoid extreme temperatures, vibrations, hazardous machinery, and unprotected heights.  Such a person would be able to perform plaintiff's past work.  (Tr. 108).  She further testified that plaintiff's past work could be performed by the individual even if restricted to work at the sedentary level.  No work would be available for an individual who was off-task ten percent of the workday or had two or more absences per month.  (Tr. 109-11).  An individual who needed a longer introductory period to learn new tasks would require an accommodation to perform either skilled or unskilled work.

### B.   Medical Evidence

Given the extensive medical records in this case, a chronological recitation of the medical evidence is impractical.  Instead, the Court separately addresses plaintiff's most complex conditions, in roughly chronological order. In addition, plaintiff was treated for allergies and asthma by an immunologist and had frequent contacts with primary care physicians for treatment of pernicious anemia, Vitamin D deficiency, GERD, and hyperlipidemia.  She also had counseling for depression.[3]  In total, she had more than 190 medical appointments, excluding imaging tests and dental care, in a span of seven years.[4]

---

[3] Medical providers described plaintiff as depressed or anxious on multiple occasions.  (Tr. 493-94, 750-54, 557-63, 727-30, 687-92, 914-19, 1526, 1556, 1590, 2006-09).

[4] Plaintiff had more than 30 medical appointments in 2016 and nearly 70 in 2017.

1.     Treatment related to hydrocephaly and Chiari malformation

In 1997, plaintiff underwent surgery to implant a ventriculo-peritoneal shunt (VP shunt) to treat hydrocephaly.  (See, e.g., Tr. 513 (listing medical history)).  According to a description written by plaintiff's sister, the shunt succeeded at addressing plaintiff's symptoms for six months before she experienced blackouts, which were caused by elevated protein levels in her cerebrospinal fluid.[5]  (Tr. 385; see also Tr. 93) (plaintiff's testimony that she experienced blackouts and severe cognitive impairments).  During surgery to revise the shunt, plaintiff had unexplained neurological changes and underwent decompression surgery to enlarge the foramen magnum in the occipital region.  (Tr. 385).  She had a total of seven surgeries in nine days, including insertion of a gastrostomy tube.  There followed "approximately 11 weeks of varying degrees of responsiveness," without speech or voluntary movement, during which time plaintiff had a bout of flu and a clot "somewhere in [her] cerebral vasculature."  Id.  She then spent several weeks in rehabilitation, "learning to walk, talk, etc."  Id.  She was discharged in a wheelchair and with a walker, but progressed quickly.  She had some tremors for which she was prescribed antiparkinsonian drugs, but the side effects were too severe and the symptoms improved on their own over time.  Id.  A CT scan of the brain completed on March 8, 2005, showed "focal zones of hypodensity" in the right frontal lobe and an area of the corpus collosum which "may represent areas of encephalomacia."[6]  (Tr. 393-94).  There was also evidence of a

---

[5] Although the information from plaintiff's sister is not medical evidence, the Court has included it here to provide the context for plaintiff's subsequent medical conditions and treatment during the period under review.  Nothing in the statement is contradicted by evidence from medical providers.

[6] "Encephalomalacia is the softening or loss of brain tissue after cerebral infarction, cerebral ischemia, infection, craniocerebral trauma, or other injury."  Emin Karaman et al., Encephalomalacia in the Frontal Lobe: Complication of the Endoscopic Sinus Surgery, J. of Craniofacial Surgery, Vol. 22, Issue 6 at 2374-75 (Nov. 2011), found at https://journals.lww.com/jcraniofacialsurgery/Abstract/2011/11000/Encephalomalacia_in_the_Frontal_Lobe__.95.a spx (last visited Feb. 24, 2020).

possible "small old infarct."  No major changes were noted in subsequent imaging studies in 2009, 2014, and 2017.[7]  (Tr. 399-400, 415-16, 1399).

In March and April 2017, plaintiff reported that she felt swelling around the VP shunt valve and tubing.  The area was extremely tender to palpation but imaging studies showed no discontinuities in the shunt.  No intervention was required.  (Tr. 1335-43, 1401-02; 1002-04).

## 2.    Diabetes and Hashimoto's thyroidosis

Plaintiff was diagnosed with Hashimoto's thyroiditis in 2006 and diabetes mellitus in February 2009.  (Tr. 2048) (listing medical history).  In addition, she was diagnosed with polyglandular autoimmune syndrome and had a mutation of the MTHFR gene.[8]  (Tr. 1796, 513, 560).  Due to hypoglycemic unawareness, she was very fearful that she would not detect a hypoglycemic event.  As a result, she checked her blood sugars up to 10 times a day, allowed her blood sugars to run high "due to living alone," and did not take pain medications at night.  (See, e.g., Tr. 557, 750).  In October 2015, Veronica P. McGregor, M.D., assessed plaintiff with uncontrolled Type 1 diabetes with neuropathy.  (Tr. 560-61).  She noted that plaintiff "is a very anxious person and this is a problem with treating her diabetes.  She checks her sugars constantly and stacks the insulin."  In addition, plaintiff did not do well balancing her thyroid replacement medications and the requirements for managing her diabetes.  (Tr. 1942, 696-97).  In August 2017 and February 2018, Christy Richardson, M.D., noted that plaintiff's diabetes was trending out of control and was still labile and that her Hashimoto's was "over replaced."  (Tr. 1887-88,

---

[7] The 2017 report referred to areas of "linear gliosis" in the right front temporal lobe.  "Gliosis" is a "process leading to scars in the central nervous system that involves the production of a dense fibrous network of neuroglia (supporting cells) in areas of damage."  https://www.medicinenet.com/script/main/art.asp?articlekey=25457 (last visited on Feb. 24, 2020).

[8] The MTHFR gene helps break down the amino acid homocysteine.  A mutation in the MTHFR gene may cause homocysteine to build up in the blood, leading to various health problems, including homocystinuria, a disorder that affects the eyes, joints, and cognitive abilities, and an increased risk of heart disease, stroke, high blood pressure, and blood clots.  https://medlineplus.gov/lab-tests/mthfr-mutation-test/ (last visited on Feb. 24, 2020).

1942).  According to Dr. Richardson, plaintiff had limited understanding regarding her disease process and "unrealistic expectations" with respect to how thyroid therapies affected glycemic stability.  (Tr. 1942).

### 3.     Complaints of pain

Plaintiff's history of musculoskeletal and neurologic pain predates the period under review.  In 1995, she had surgery to address TMJ syndrome.  (Tr. 509).  Following her coma, she had complaints of right foot drop, which was treated with some success with physical therapy and orthotics[9] until 2009, when she began to experience more pain.  (Tr. 94, 509-10).  Thereafter, she wore a walking boot on her right foot for three years.  (Tr. 544).  Diagnostic studies in 2011 and 2012 showed mild plantar fasciitis, bursitis, tendinopathy, and nerve entrapments across the tarsal tunnel.  (Tr. 401-06).  In April 2012, pain management specialist Edwin Dunteman, M.D., noted that plaintiff had some sensory alterations in her right thigh, foot, and ankle; "heel strike restrictions;" and some tenderness on palpation.  (Tr. 509-11).  She was assessed with neuralgia, neuritis, unspecified.   A trial of Topamax was discontinued due to side effects.  (Tr. 506-07).  A nerve conduction velocity (NCV) test of the lower extremities completed in May 2012 was normal, while the results of an electromyography (EMG) were suggestive of a neuropathic problem at or near the L5 level.  (Tr. 407-10).  A CT scan of the lumbosacral spine in August 2012 showed a very mild bulge at L4-5 and a mild bulge at L5-S1 without evidence of central canal stenosis.  (Tr. 472-73).   Nerve blocks and topical applications provided only mild, temporary relief.  (Tr. 499-500, 490-91, 485-86).  In August 2012, Dr. Dunteman noted that the etiology of plaintiff's pain was unclear and atypical and had "a behavioral/anxiety overlay as

---

[9] Between 2015 and 2017, plaintiff had several visits with podiatrists to make or modify orthotics.  (Tr. 628-29, 980-81,  984-85, 1095-96, 2097-98, 2099-200, 2101-02, 2103-04).

well."  (Tr. 494).  Right tarsal tunnel surgery in April 2013 considerably improved plaintiff's foot and nerve pain.  (Tr. 481-83).

Between 2013 and 2019, plaintiff received treatment from several providers for a variety of musculoskeletal and/or neurogenic pains throughout her body.  For instance, in late 2013, Dr. Dunteman noted that plaintiff had pain in her left knee, possibly as a consequence of gait changes caused by wearing a boot on her right foot for three years.  (Tr. 481-83).  In November 2013, plaintiff had poor scores on the Lower Extremity Functional Scale and the Oswestry Low Back pain scale.  (Tr. 462).  In March 2014, it was noted that plaintiff had "some sort of right knee area entrapment," despite an unremarkable physical examination.  (Tr. 2067).  In December 2014, she had severe right leg pain and a lot of pain in the upper back and shoulders.  (Tr. 2051).  In May 2015, plaintiff underwent a successful release of the right peroneal nerve at the fibular head.  (Tr. 645-49, 644).  Shortly thereafter, however, she began to experience pain in her left foot, ankle, and hip.  In August 2015, she reported to orthopedic surgeon Richard Helfrey, D.O., that she could not wear orthotics due to pain and could walk only if her left foot was "wrapped up."  (Tr. 512-14).  An MRI of plaintiff's left leg showed possible low grade strain or denervation of the left calf and diffuse fatty atrophy of the musculature in both calves.  (Tr. 612, 2204).  An MRI of the lumbar spine showed no evidence of spinal canal or neuroforaminal narrowing.  A small disc protrusion at T12-S1 was noted but not deemed to be problematic.  (Tr. 610).  An NCV test in August 2015 showed left radiculopathy at L5-S1 and possible nerve entrapment while an NCV of the left peroneal in October 2015 was normal.  (Tr. 605, 2197-98).  She underwent a short course of physical therapy to address pain in her left hip and leg in November and December 2015.[10]  (Tr. 543-47, 548-49, 550-51, 552-53, 554-55).  She began wearing a walking boot on her left foot in December 2015.  (Tr. 554-55).  CT scans in March

_____

[10] Plaintiff terminated the physical therapy when she was laid off.  (Tr. 554-55).

2016 showed narrowing of the medial joint space associated with subarticular sclerosis which could be a bone bruise or arthritic; there was no evidence of central canal stenosis.  (Tr. 411-14). An EMG nerve study in April 2016 showed evidence of left medial plantar neuropathy, but no evidence of peripheral or peroneal neuropathy or lumbar radiculopathy.  (Tr. 975-76).

In June 2016, neurosurgical specialist Thomas R. Forget, M.D., completed an evaluation of plaintiff's left calf pain.  (Tr. 995-1000).  A comprehensive examination disclosed only antalgic hamstring weakness and antalgic gastrocnemius weakness.  She had no focal motor or sensory defect and studies showed no evidence of peripheral nerve compression, significant spinal stenosis or compression, or muscle tear or edema.  (Tr. 958, 611).  Thus, there were no surgical interventions available to treat her pain.  Pain management specialist Greg Smith, D.O., diagnosed plaintiff with chronic pain syndrome and recommended a TENS unit and a trial of Lyrica. (Tr. 667-72).  At follow up in August 2016, Dr. Smith noted that most of plaintiff's pain was in the saphenous nerve distribution.  He provided a prescription for a TENS unit.  (Tr. 673-76).

Plaintiff had multiple courses of physical therapy.  Between December 2016 and January 2017, she participated in therapy to address persistent pain in her right elbow after she twisted her arm.  (Tr. 1021-23, 1243-47, 1248-50, 1251-53, 1257-61, 1262-64, 1265-67, 1268-69, 1270-72, 1272-75, 1276-78).  At discharge on January 31, 2017, plaintiff still had some weakness in her elbow and wrist but the pain in her elbow had improved and only minimally interfered with her daily activity.  (Tr. 1276-78).  An MRI on January 21, 2017, revealed peroneal tendinopathy of the right leg.  (Tr. 1089).  A steroid injection administered to her right ankle initially made the pain worse, but she later reported some improvement.  (Tr. 1280, 1109).  In February 2017, plaintiff returned to physical therapy to treat pain in right ankle and lower leg and, in March, she

added treatment for pain in her left calf.  (Tr. 1279-84, 1285-87, 1288-90, 1291-93, 1294-96, 1297-99, 1300-02, 1303-08, 1309-11, 1312-14, 1315-17, 1318-20, 1321-23, 1324-26, 1327-29, 1330-32, 1333-35).  At discharge in May 2017, plaintiff's left leg had improved but she continued to experience a lot of pain in her right leg.  (Tr. 1333-35).

In February 2018, an orthopedist assessed plaintiff's right foot and ankle pain as neuropathic pain, possibly due to complex regional pain syndrome, for which nerve blocks might be helpful.  She was not a candidate for orthopedic surgery.  (Tr. 1782-83).  In March 2018, Rajiv Shah, M.D., determined that plaintiff did not meet the criteria for chronic regional pain syndrome.  (Tr. 2130).  The following month, he assessed plaintiff with chronic pain, cervical radicular pain, and neuropathic pain of the right lower extremity.  Plaintiff was again referred to physical therapy.  (Tr. 22).  She could not receive steroid injections to treat cervical pain due to the location of a dural graft she received during the Chiari surgery.  (Tr. 2132).

In May 2017, patient sought treatment from Bernard Randolph, Jr., M.D., for shoulder and neck pain.  (Tr. 1161-82).  On examination on May 8, 2017, Dr. Randolph noted decreased range of cervical motion and foraminal encroachment, with trigger points in cervical and proximal shoulder.  (Tr. 1173).   X-rays disclosed moderate to severe degenerative changes at C6-7 with milder changes at C5-6.  He assessed her with cervical radicular syndrome.  An MRI of the cervical spine showed disc degeneration at C6-7 with minimal bulging at C5-6.  (Tr. 1405-06).  At follow-up in June 2017, plaintiff continued to experience pain in her left arm and shoulder, in addition to her low back.  On examination, plaintiff had mild to moderate pain of the cervical and lumbar spine, with some tenderness in lumbar musculature and the left hip girdle. (Tr. 1210-11).  Dr. Randolph's clinical impression was myofascial pain at the cervical level and cervical spondylosis with radicular irritation at C6-7.  Plaintiff's lumbar pain was primarily

muscular/axial in character.  She received an injection in a trigger point.  Her finances did not allow her to participate in physical therapy at that time and she was provided with a home exercise program.  In July 2017, plaintiff reported a 50% improvement in pain.  She received another trigger point injection.  (Tr. 1229-30).

### 4.   Neurologist Max P. Benzaquen, M.D.

Dr. Benzaquen treated plaintiff for neurological complaints since at least March 2005, when he ordered a CT scan.  (Tr. 393-94).  November 2011 records from plaintiff's primary care physician show that Dr. Benzaquen prescribed a diuretic for cerebral pressure, Adderall for fatigue, and trazodone for depression.  (Tr. 2092).  The earliest record from Dr. Benzaquen himself is dated January 2014, when he noted that plaintiff had a history of entrapment neuropathies and was diagnosed with peripheral nerve disease.   (Tr. 2195).  Despite an unremarkable physical examination, he increased her dosage of gabapentin.  In April 2014, Dr. Benzaquen noted that plaintiff's tarsal tunnel syndrome was better and that she had less pain in both feet, but still needed help with ankle-foot arthrosis. (Tr. 2194).  He did not modify her medications.

There are no additional records from Dr. Benzaquen until July 2015.[11]  (Tr. 2192-93). Plaintiff reported at that time that she was doing well.  She was working full time following a good outcome from her right peroneal nerve release.[12]  She had no paresthesias or weakness in her legs.  On review of systems, plaintiff denied balance disturbance or dizziness but endorsed easy and excessive fatiguability, headaches, memory loss, numbness and tingling, pain, ringing

---

[11] The format of Dr. Benzaquen's medical records changed at this time to include notes for past medical history, surgical history, medications, and review of systems.  (Tr. 2192-93).  The information contained under these headings is incomplete, however.  For example, directly under a paragraph noting that plaintiff had undergone a right peroneal release, the notes state that she has no known surgical history.

[12] This is consistent with what plaintiff reported to primary care physician Saana Waheed, M.D., on June 26, 2015. (Tr. 740-44).

in her ears, and sleep complaints.  She was assessed with unspecified hereditary and idiopathic peripheral neuropathy.  Dr. Benzaquen prescribed Adderall, ordered lab tests, and referred plaintiff to an orthopedic surgeon for evaluation of her left foot pain.  (See Tr. 512).  On August 24, 2015, Dr. Benzaquen described plaintiff's condition as cervical radiculopathy, and noted that she complained of pain in her left calf and weakness in her left leg.  (Tr. 603-06).[13] He stated that she had no history of fibromyalgia, although fibromyalgia was listed as a diagnosis as early as November 2011.  (Tr. 2092-94).  The only abnormalities noted on examination were myoclonus in her upper right extremity, and the absence of patellar and Achilles reflexes.  He ordered lab tests and an MRI of the lumbar spine.

On September 28, 2015, Dr. Benzaquen listed neuropathic findings of paresthesias and loss of sensation in her lower extremities.  (Tr. 600-02).  He did not make any changes to her medications.  About a week later, plaintiff presented with left gluteal pain with sciatica and foot drop tendency.  A left peroneal NCV test was normal.  (Tr. 597-99).  In December 2015, Dr. Benzaquen noted that plaintiff's sciatic pain had improved but that she now had pain in the left gastrocnemius, which he injected with Depo-Medrol and lidocaine.  (Tr. 593-96).

When plaintiff next presented in April 2016, Dr. Benzaquen noted entrapment neuropathies, chronic somatic and neuropathic pain, pain on palpation of the left calf (described as "very painful"), and exaggerated muscle tension of the lumbar muscles, for which he prescribed the muscle relaxant, Amrix.  (Tr. 589-92).  He nonetheless described plaintiff's pain

---

[13] By this time, Dr. Benzaquen's records also included a section on the results of his examination.  Her musculoskeletal exam was normal with no spinal tenderness.  She had no clubbing, cyanosis or edema. Examination of the cranial nerves was unremarkable.  A motor examination of her upper extremities showed normal tone, bulk, strength.  She did have myoclonus on the right.  Her lower extremity exam was similarly unremarkable. She had no patellar or Achilles reflexes.  On sensory examination, Dr. Benzaquen noted that plaintiff did not have hyperesthesias.  There was no discussion of hypoesthesias.  Unfortunately, all subsequent examination notes were copied without modification — including typographical errors — from these initial notes entered on August 24, 2015.  Any new findings in the subsequent examinations were noted elsewhere in the notes, typically below the copied examination results.

as stable and under control.  He continued her prescription for Adderall.  In July 2016, plaintiff continued to have tenderness of the left calf muscles and had a positive response to a test for nerve irritation on the left posterior tibial mid portion.  (Tr. 586-88).  Dr. Benzaquen ordered an MRI of the left lower limb and prescribed Gralise, an alternate form of gabapentin.  In August 2016, Dr. Benzaquen noted that plaintiff had chronic headaches as a sequelae of her Chiari malformation.  She continued to have leg pain that she rated between 4 and 7 on a 10-point scale. Dr. Benzaquen described plaintiff's condition as complex regional pain.  (Tr. 2167-70).  He continued her prescription for Amrix, which provided mild relief, and added Silenor for insomnia and the opioid Nucynta for pain.  In November 2016, Dr. Benzaquen noted that plaintiff had a history of entrapment neuropathies with decompressive surgeries.  (Tr. 961-64). Her intermittent pains were presently in her plantar nerves.  In addition, he stated, she now presented with fibromyalgia symptoms, for which he prescribed Savella.  A nerve entrapment test was positive for the right peroneal and post tibial nerves.

On January 10, 2017, Dr. Benzaquen described plaintiff as having a history of neuropathy and myofascial pain, fibromyalgia type.  On examination, she had "hypoesthesia in glove stocking distribution."  She asked him to complete a disability assessment.  (Tr. 2159-62).   In April 2017, Dr. Benzaquen described plaintiff as having diabetic neuropathy, chronic pain due to fibromyalgia, lumbar disc disease, pernicious anemia, and Hashimoto's thyroiditis.  (Tr. 2155-58).  She "has been maintained in better pain control" and "lately, has been in good diabetes control."[14]   He continued her medications.   In September 2017, Dr. Benzaquen described plaintiff as doing well, but continued her pain medications.  (Tr. 2151-53).  In December 2017, Dr. Benzaquen described plaintiff as "stable on deficits."  (Tr. 2147-50).

---

[14] By August 2017, however, an immunologist described plaintiff's diabetes as trending out of control and still labile.  (Tr. 1887).

In April 2018, Dr. Benzaquen injected plaintiff's left ankle with Depo Medrol and Lidocaine. (Tr. 2143-46). In June 2018, he prescribed the muscle relaxant tizanidine. (Tr. 2141-42). Finally, an NCV conducted on January 3, 2019, showed entrapments of the left peroneal nerve and posterior tibial nerve. (Tr. 10).

### 5. Opinion evidence

On November 17, 2016, State agency consultant Donna McCall, D.O., completed a physical residual functional capacity assessment based on a review of medical records through November 2016. (Tr. 121-26). Dr. McCall opined that plaintiff could frequently lift or carry up to 10 pounds and occasionally lift or carry up to 20 pounds; could stand and/or walk for a total of 2 hours in an 8-hour day; sit for a total of 6 hours in an 8-hour day; and occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl. She had no manipulative restrictions. The ALJ afforded Dr. McCall's opinion significant weight because it was "largely consistent with the medical evidence." (Tr. 39).

Also on November 17, 2016, Raphael Smith, Psy.D., completed a Psychiatric Review Technique form. (Tr. 119-21). Dr. Smith concluded that plaintiff had a medically determinable impairment in category 12.04 (affective disorders), but that her impairment was non-severe. Dr. Smith noted that plaintiff had a mild episode of major depression that was stable on medication provided by her primary care physician. With respect to plaintiff's allegations of cognitive impairment, Dr. Smith cited Dr. Benzaquen's notes from November 2016, in which plaintiff denied having any memory or psychiatric problems. Dr. Smith opined that plaintiff had mild restrictions in the activities of daily living, had mild limitations in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. She had no episodes of decompensation of an extended duration. (Tr. 119). The ALJ gave great weight to

Dr. Smith's opinion, noting that plaintiff had normal mental status evaluations and that her depression had resolved by January 2017.  (Tr. 35).

Dr. Benzaquen completed a medical source statement on April 10, 2017.  (Tr. 967-70). He listed plaintiff's diagnoses as "diabetic polyneuropathy, advanced; Arnold-Chiari malformation, operated 1997; Hashimoto's thyroiditis, under treatment; chronic neuropathic pain with fibromyalgia; traumatic brain injury, past prolonged coma 1997; and vertebral disc disease with spondylosis."  (Tr. 967) (cleaned up).  He opined that plaintiff had the capacity to sit, stand, or walk for no more than one hour in an 8-hour workday and to occasionally lift and carry no more than 5 pounds.  She had significant manipulative limitations in both hands and was limited in balancing.  She could only occasionally reach over her head and could never stoop.  Objective indications of pain included muscle atrophy, muscle spasm, reduced range of motion, sensory disruption, and motor disruption.  Subjective indications of pain included complaints of pain, change in weight, sleeplessness, irritability, and grimaces.  Plaintiff's pain would preclude her from persisting or focusing on simple tasks on a sustained basis and would cause her to miss work three or more times a month.  She would need to take three or more breaks in the workday, and lie down or nap.  She should use a cane or other assistive device.  Plaintiff's limitations dated back to 2003.

Dr. Benzaquen also completed a mental medical source statement.  (Tr. 971-74).  He identified plaintiff's diagnoses as "sequelae of traumatic brain injury: attention deficits, short-term memory, easy distractibility, difficult to perform under stress."  (Tr. 974).  In assessing plaintiff's functional capacity, Dr. Benzaquen opined that she was moderately impaired in the abilities to function independently; behave in an emotionally stable manner; relate to family, peers, or caregivers; and ask simple questions or request help.  She was markedly impaired in her

abilities to adhere to basic cleanliness standards[15] and maintain socially appropriate behavior. Dr. Benzaquen further opined that plaintiff was limited to working in a task-oriented setting that required only casual and infrequent contact with coworkers, but had no limitation in her abilities to interact normally with supervisors and the general public.  She had the capacity to focus and persist on simple tasks for 30 minutes and would be able to maintain an average pace of production of simple tasks in a low-stress environment.  Her psychologically-based symptoms would not interfere with her attendance.  The ALJ gave Dr. Benzaquen's opinions "minimal weight," because there was "no persuasive evidence for such stringent limitations," noting in particular that plaintiff's physical examinations were "generally normal" and that she had no weakness and a normal gait in June 2018.  (Tr. 39).  The ALJ rejected Dr. Benzaquen's mental source statement because he is not a psychiatrist.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act.  See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any

---

[15] Immunologist Hamsa N. Subramanian, M.D., noted that plaintiff was highly allergic to dog dander.  Nonetheless, she appeared with "dander all over her shirt."  (Tr. 1995, 538).

other kind of substantial gainful work which exists in the national economy."   42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.

Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above, terminating at step four. (Tr. 31-41). The ALJ found that plaintiff met the insured status requirements through December 31, 2020 and had not engaged in substantial gainful activity since December 10, 2015, the alleged onset date. (Tr. 19). At step two, the ALJ found that plaintiff had the severe impairments of type 1 diabetes mellitus with peripheral neuropathy, degenerative disc disease and cervical spondylosis with radiculopathy, status-post ventriculoperitoneal shunting due to hydrocephalus after surgery for a Chiari malformation, and obesity.[16] The ALJ found that plaintiff's pernicious anemia, asthma, and hypothyroidism were controlled with treatment, while her GERD, polyglandular autoimmune syndrome, and hyperlipidemia were asymptomatic. Thus, these conditions were all nonsevere. (Tr. 33-34). Her depression did not cause more than minimal limitation in her ability to perform basic mental work activities and was thus nonsevere.[17] The ALJ did not address plaintiff's fibromyalgia or history of brain injury. The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 35).

The ALJ next determined that plaintiff had the RFC to perform light work but was restricted from climbing ladders, ropes or scaffolds, and could only occasionally stoop, kneel, crouch or crawl, or climb ramps or stairs. She was required to avoid temperature extremes, concentrated exposure to vibration, unprotected heights, and operational control of dangerous

---

[16] Plaintiff was 5 feet, 3 inches tall and her weight ranged between 166 and 179 pounds. (Tr. 477, 1047).

[17] The ALJ analyzed the "paragraph B" criteria and found that plaintiff had mild limitations in the functional areas of understanding, remembering, or applying information; and sustaining concentration, persistence, and pace. She had no limitations in the areas of interacting socially and adapting to change and managing oneself. (Tr. 34-35). Plaintiff also did not meet the "paragraph C" criteria. (Tr. 21).

machinery.  (Tr. 35).  In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding her abilities, conditions, and activities of daily living.  While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence.  (Tr. 36).

At step four, the ALJ concluded that plaintiff was able to return to her past relevant work as a cytogenic technician and data entry clerk.  (Tr. 40).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from December 15, 2015 — the alleged onset date — through October 31, 2018 — the date of the decision.  (Tr. 40-41).

## V. <u>Discussion</u>

Plaintiff argues that the ALJ improperly evaluated the medical opinion evidence and her credibility.  The Court finds that the ALJ's failure to address plaintiff's claims that she is disabled due to fibromyalgia and a history of brain injury undermine the ALJ's analysis of both Dr. Benzaquen's opinion and plaintiff's credibility.

When evaluating opinion evidence, an ALJ is required to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources.  <u>See</u> 20 C.F.R. § 404.1527(e)(2)(ii).  The regulations require that more weight be given to the opinions of treating physicians than other sources.[18]  20 C.F.R. § 404.1527(c)(2).  Similarly, more weight is given to examining sources than to nonexamining sources.  20 C.F.R. § 404.1572(c)(1).  According to the regulations, the opinions of treating medical sources are

---

[18]This continues to be true for plaintiff's claim because it was filed before March 27, 2017.  <u>Combs v. Berryhill</u>, 868 F.3d 704, 709 (8th Cir. 2017); 20 C.F.R. § 404.1527 ("For claims filed . . . before March 27, 2017, the rules in this section apply."); § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

given more weight because they are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of the claimant's impairments and may bring a unique perspective

to the medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations or brief

hospitalizations.  20 C.F.R. § 404.1527(c)(2).  "A treating physician's opinion should be granted

controlling weight if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the record."

Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016) (internal quotation and citations

omitted).  A treating physician's opinion, however, "does not automatically control or obviate

the need to evaluate the record as a whole."  Id. at 1122-23 (citation omitted).  Rather, "an ALJ

may discount or even disregard the opinion of a treating physician where other medical

assessments are supported by better or more thorough medical evidence or where a treating

physician renders inconsistent opinions that undermine the credibility of such opinions."  Id.

(citation omitted).

Where the ALJ does not give a treating physician's opinion controlling weight, the ALJ

must evaluate the opinion based on several factors, including the length of the treatment

relationship and the frequency of examination, the nature and extent of the treatment

relationship, the evidence provided by the source in support of the opinion, the consistency of the

opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. §§

404.1527(c)(2)-(6), 416.927(c)(2)-(6).  And, the ALJ must give "good reasons" for discounting a

treating physician's opinion.  See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007)

(internal quotation marks omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We

will always give good reasons in our notice of determination or decision for the weight we give

your treating source's medical opinion."). The failure to give good reasons for discrediting a treating physician's opinion is a ground for remand. Snider v. Saul, No. 4:18-CV-1948-SPM, 2020 WL 905851, at *4 (E.D. Mo. Feb. 25, 2020) (citing Anderson v. Barnhart, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); Clover v. Astrue, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand.")).

As an initial matter, the ALJ failed to note that Dr. Benzaquen was a specialist who had treated plaintiff for at least 12 years and thus had ample opportunity to observe changes in plaintiff's condition over time. More significantly, the ALJ failed to address plaintiff's fibromyalgia, which was diagnosed as early as 2011. Dr. Benzaquen cited fibromyalgia as a condition supporting his assessment of plaintiff's limitations. Fibromyalgia is "a common neurologic health problem that causes widespread pain and tenderness . . . The pain and tenderness tend to come and go, and move about the body." https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Fibromyalgia (last visited Feb. 24, 2020). The most common symptoms of fibromyalgia are pain and stiffness all over the body; fatigue and tiredness; depression and anxiety; sleep problems; problems with thinking, memory, and concentration; and headaches. Centers for Disease Control and Prevention, https://www.cdc.gov/arthritis/basics/fibromyalgia.htm (last visited Feb. 24, 2020). Plaintiff endorsed all of these symptoms, in addition to tingling or numbness in her hands and feet, and temporomandibular joint syndrome (TMJ). See id. (listing additional symptoms). The Eighth Circuit recognizes that fibromyalgia is a chronic condition that is difficult to diagnose and may

be disabling.  Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005) (per curiam).  Because the ALJ never addressed plaintiff's fibromyalgia, the ALJ's assessment of Dr. Benzaquen's opinion is based on an incomplete review of the record and thus not supported by good reasons.

The ALJ also failed to give good reasons for rejecting Dr. Benzaquen's opinion that, due to her history of traumatic brain injury and its sequelae, plaintiff could not maintain focus for more than 30 minutes without redirection.  The ALJ rejected this assessment because Dr. Benzaquen is not a psychiatrist.  In doing so, the ALJ ignored the fact that Dr. Benzaquen's limitations were not based on a psychiatric disorder, but on an organic brain condition which, as a neurologist, Dr. Benzaquen is qualified to assess.

The Court finds that the ALJ failed to give good reasons for discounting Dr. Benzaquen's opinion.  Accordingly, this matter will be remanded for further consideration of plaintiff's fibromyalgia and history of traumatic brain injury.  If necessary, the commissioner should obtain a consultative evaluation.  In addition, it may be appropriate to obtain a formal assessment of plaintiff's cognitive functioning and capacity to maintain concentration, persistence and pace.

The ALJ's failure to address plaintiff's fibromyalgia and history of traumatic brain injury also undermine the ALJ's analysis of her credibility, which should be reassessed on remand.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.


/s/ **John M. Bodenhausen**
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of April, 2020.